560 So.2d 217 (1990)
Peter VENTURA, Appellant,
v.
STATE of Florida, Appellee.
No. 71975.
Supreme Court of Florida.
April 5, 1990.
Rehearing Denied May 29, 1990.
Thomas R. Mott, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen., and Richard B. Martell, Asst. Atty. Gen., Daytona Beach, for appellee.
PER CURIAM.
Peter Ventura appeals his first-degree murder conviction and his death sentence, imposed by the trial judge in accordance with the jury's recommendation. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed, we affirm the conviction of first-degree murder and the sentence of death.
The relevant facts are as follows. On the afternoon of April 15, 1981, a truck belonging to Crows Bluff Marina was found parked in a wooded area north of State Road 44 in Volusia County. In the cab of the truck was the body of an employee of the marina, who had been beaten over the head, shot, and possibly stabbed. The medical examiner testified that the cause of the victim's death was a bullet wound to the heart, that five holes were found in the body, and that three .38 caliber bullets were recovered from the body. Evidence at trial established that the victim had worked at the marina for nine months and that he had previously worked for Jerry Wright, who had taken out a key man life insurance policy on the victim. The record further establishes that the victim left the marina at 1:00 p.m. on April 15 to run some errands and to meet a potential customer at the Barnett Bank in Deland.
Postal authorities in Chicago, investigating another case, obtained information from informants concerning a contract murder for insurance benefits involving Peter Ventura, Jack McDonald, and Jerry Wright. The authorities passed this information along to investigators in Volusia County, and, on June 25, 1981, Ventura was arrested in Chicago for the first-degree murder of the victim. A grand jury in Volusia County indicted Ventura on June *218 30, 1981, but, while awaiting extradition, he was allowed to bond out of jail in Chicago on July 27, 1981. He was to appear for an extradition hearing on August 18, 1981, but he failed to appear. Ventura remained a fugitive until June 11, 1986, when he was arrested in Austin, Texas, after bragging to a coworker that he had committed a contract killing in Florida five years before. At the time of his arrest in Texas, Ventura identified himself as Juan Contras, but he later divulged his true identity.
The state's key witness at the trial was Ventura's codefendant, Jack McDonald. McDonald had also been indicted for the murder and was in fact arrested on June 25, 1981, the same date that Ventura was arrested. However, due to a lack of evidence, McDonald was released on a speedy trial rule violation after spending six months in the Volusia County jail. Subsequently, McDonald agreed to assist the state in its prosecution of Ventura. At that time, McDonald was under federal indictment for a bank scam for which he pled guilty and subsequently received three consecutive five-year sentences. McDonald testified at trial that in 1981 he had hired Ventura to kill the victim so that Jerry Wright,[*] the victim's former employer, could receive the benefits of the key man life insurance policy which he had taken out on the victim. Wright had borrowed some money from McDonald and had asked him to find someone to kill the victim and split the proceeds of the policy with him as repayment of the debt. McDonald testified that he intended to split his half of the money with Ventura.
McDonald set up a meeting in Chicago with Wright and Ventura, after which Ventura indicated his willingness to murder the victim. They then devised a plan wherein Ventura would travel to Volusia County in April of 1981 to carry out the job. McDonald met Ventura in Atlanta before the murder and gave him money for expenses, and he wired him more money in Volusia County after his arrival.
McDonald joined Ventura in Daytona Beach on April 13, 1981. On April 15, Ventura drove with McDonald to Deland. They stopped at the Barnett Bank in Deland and Ventura, posing as a potential customer of the marina at which the victim worked, called the victim and asked him to meet him at the bank. McDonald and Ventura had already picked out the murder site, an area off State Road 44 near an abandoned gravel pit. McDonald watched Ventura meet the victim, followed them to where they pulled off the road, and waited on the side of the road. About ten minutes later, Ventura came running across a field, and he and McDonald returned to Daytona Beach. Later, Ventura left on a bus to Atlanta with $2,000 from McDonald and Wright. After meeting with McDonald again in Atlanta, where he received more money, Ventura flew to California. He and McDonald remained in contact by telephone as they waited to hear from Wright about the insurance money. McDonald returned to Daytona Beach around June 20, 1981, to meet with Wright concerning the money, but, instead, he was arrested on the information supplied to Volusia County authorities by postal investigators.
In addition to McDonald, the state called as witnesses the two acquaintances of Ventura and McDonald who had provided the information which led to their arrests. The state also called several witnesses who confirmed through business receipts that Ventura had been in Florida on the dates in question. Ventura presented no evidence in the guilt phase of the proceeding, and the jury found Ventura guilty of first-degree murder.
In the penalty phase, the state presented no new evidence, while the defense called Ventura's daughter, his former business associate, and a lay prison minister, each of whom provided nonstatutory mitigating evidence. The jury recommended the death penalty by an eleven-to-one vote, and the trial judge imposed the death penalty two days later. In imposing the death penalty, *219 the judge found two aggravating circumstances: (1) the homicide had been committed for pecuniary gain and (2) the homicide had been committed in a cold, calculated, and premeditated manner. The court found no mitigating circumstances.

Guilt Phase
In the guilt phase of the trial, Ventura claims that: (1) the trial court erred by failing to conduct a full inquiry into the nature of Ventura's allegations of a conflict of interest and his request to discharge court-appointed counsel and into court-appointed counsel's motion to withdraw; (2) the trial court erred in not granting Ventura's request to discharge counsel and counsel's motion to withdraw; (3) Ventura was denied his right to effective assistance of counsel due to multiple errors allegedly committed by trial counsel during the course of his trial; and (4) the trial court erred by giving an instruction on flight.
We will jointly address Ventura's claims concerning an inadequate inquiry into his allegations of conflict of interest and failure to discharge his counsel. Ventura maintains that the trial judge failed to conduct an adequate inquiry into his request for new counsel and his counsel's motion to withdraw. On March 12, 1987, nine months before the trial, Ventura wrote a letter to the trial judge, in which he stated the following:
Attorney Raymond Case [sic] was appointed to my case June 16, 1986. Since then I've came to distrust Mr. Cass Because of the many lies he has told me and the lack of any Motions filed by him in this most severe case. There are also several other thing's that bring us into conflic [sic].
... If at all possible would you please appoint Mr. Craig Boda.
In a letter dated March 20, 1987, the trial judge responded to Ventura, explaining that Ventura's letter
raises insufficient grounds to discharge the Public Defender's Office and appoint a private attorney to represent you at the taxpayer's expense.
Legally, you would have the right to refuse the services of the Public Defender's Office and either represent yourself or hire your own attorney at your expense.
Because of the nature of the charge, I would strongly urge you not to try to represent yourself and if you cannot afford to hire your own attorney, then stay with the Public Defender's Office.
On May 1, 1987, the assistant public defender who was representing Ventura filed a motion to appoint a special public defender pursuant to chapter 27, Florida Statutes (1985). In that motion, counsel certified that there was a conflict between Ventura and himself. As evidence of such conflict, he appended to the motion copies of various pro se pleadings which Ventura had filed in both the trial court and the Fifth District Court of Appeal without counsel's knowledge, copies of correspondence between Ventura and the trial judge, and a copy of a letter which Ventura had written to counsel. In the letter to counsel, Ventura expressed his lack of trust, stating:
I've met with your Investigator three time's [sic]. First time he introduced Himself and told me to keep my mouth shut. Second time, He acted in you [sic] behalf and brought be [sic] a continuance to sign, along with some facts pertaining to Mr. Edward Adkin's [sic] an Informant. (Because of the fact that the Public Defenders office helped in Reducing his Sentence in Half, because of a Statement he made against my case, I now feel and Do believe that we have a conflict of Interest.)
Ventura's counsel, in his motion, specifically denied the allegations made by Ventura, but he did seek to withdraw from the case based upon Ventura's behavior and allegations.
The trial judge held a hearing on counsel's motion on May 5, 1987. At the hearing, Ventura's attorney argued that the conflict of interest arose from the inability to form and maintain the attorney/client relationship. He further argued that Ventura's false accusations of wrongdoing had adversely affected their relationship. Ventura *220 again stated that he wished to have his counsel discharged, but he made no mention at the hearing of his previous allegations of conflict concerning Edward Adkins. The only complaints that he voiced concerned the number of continuances which had been sought and granted in his case. According to the transcript of the hearing, the judge responded to that complaint as follows:
Now, I don't have a photographic memory. I can't swear that each and every time you were in court, but if you were in the courtroom, normally, I also get the defendant to consent or agree to his attorney's request for a continuous [sic]. Now, I can't say that that happened every time in your case, but maybe somewhere along the line, in maybe one or two of your continuances, you might have been in court and heard you're [sic] attorney make the continuances.
Do you recall if you were in court when your attorney made motions to continue?
THE DEFENDANT: Several of them, Your Honor.
THE COURT: Okay. Unless I deviated from my normal policy, I always ask the defendant if he agrees to the continuance and waiver and if the defendant says no, then, of course, I don't grant it.
The trial judge then addressed Ventura's request that his counsel be replaced by another attorney. The judge explained to Ventura why the attorney he had requested could not be appointed to represent him:
Well, in '81, he probably still was with the State Attorney's Office even if Number one, he was willing to take the case and Number two, I would be willing to let you designate which attorney to pick which I would not since we have a rotating list.
Mr. Boda, apparently, couldn't have taken the case anyway because he was with the State Attorney's Office when this offense first came up.
The judge then denied Ventura's counsel's motion to withdraw, and counsel immediately requested another continuance in order to take depositions which he had not taken because of his intention to withdraw and Ventura's filing of pleadings in the appellate court. The court sought Ventura's approval of the continuance, and he agreed to it. When Ventura again complained of the number of delays in his case, the judge explained that it was normal for there to be a number of continuances in a first-degree murder case. The judge then granted the continuance and concluded the hearing.
We find that the trial judge conducted a sufficient inquiry into the complaints and concerns of Ventura and of his counsel. Ventura had an opportunity to fully present all of his allegations at that hearing. We note the allegation concerning the asserted conflict pertaining to Edward Adkins was not mentioned by Ventura at that hearing, nor was it ever mentioned again subsequent to his initial letter. We find no indication in this record that subsequent conflicts arose between Ventura and counsel, and we hold that Ventura's claim in this regard is without merit.
The next claim raised by Ventura is that he was denied his right to effective assistance of counsel and a fair trial. He presents nineteen separate incidents which he asserts were mistakes committed by his counsel during the trial of the cause. We recognize that such claims may more properly be addressed in a motion for postconviction relief under rule 3.850, Florida Rules of Criminal Procedure, particularly because of the opportunity for an evidentiary hearing. However, in limited circumstances, we have previously addressed ineffective assistance of counsel claims when presented in an appeal on the merits. See Stewart v. State, 420 So.2d 862 (Fla. 1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1802, 76 L.Ed.2d 366 (1983); Foster v. State, 387 So.2d 344 (Fla. 1980). Given this record, we hold that none of these claims of ineffective assistance of counsel warrant relief, but we do so without prejudice to Ventura to assert these claims in a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850.
*221 As his final claim concerning the guilt phase of the trial, Ventura asserts that the trial court improperly instructed the jury on flight. He suggests that there was insufficient evidence to warrant a flight instruction under the factors set forth in our decision in Bundy v. State, 471 So.2d 9 (Fla. 1985), cert. denied, 479 U.S. 894, 107 S.Ct. 295, 93 L.Ed.2d 269 (1986). The evidence in this case suggests otherwise. He was arrested for the murder in Illinois, he posted bond, and he fled that jurisdiction. When Ventura was re-arrested five years later, he was living under an assumed name. We conclude that, under the facts of this case, the trial court's instruction on flight was clearly appropriate. See Harvey v. State, 529 So.2d 1083 (Fla. 1988), cert. denied, ___ U.S. ___, 109 S.Ct. 1175, 103 L.Ed.2d 237 (1989); Bundy; Washington v. State, 432 So.2d 44 (Fla. 1983); Mackiewicz v. State, 114 So.2d 684 (Fla. 1959), cert. denied, 362 U.S. 965, 80 S.Ct. 883, 4 L.Ed.2d 879 (1960); Daniels v. State, 108 So.2d 755 (Fla. 1959).

Penalty Phase
Ventura challenges his death sentence on the grounds that Florida's death penalty statute (1) violates the rights to due process and a jury trial guaranteed by the constitutions of Florida and of the United States in that, in rendering its verdict, the jury did not consider the elements that statutorily define the crime for which the death penalty may be imposed; and (2) violates the sixth, eighth, and fourteenth amendments because the statutory aggravating and mitigating circumstances, as applied by trial and appellate courts, do not truly limit the class of persons who are eligible for the death penalty. With regard to his first claim, Ventura is asserting that the death penalty is improperly imposed when the jury does not expressly find any factors in aggravation. This claim was never presented to the trial court, and we find it to be procedurally barred. See, e.g., Swafford v. State, 533 So.2d 270 (Fla. 1988), cert. denied, ___ U.S. ___, 109 S.Ct. 1578, 103 L.Ed.2d 944 (1989); Eutzy v. State, 458 So.2d 755 (Fla. 1984), cert. denied, 471 U.S. 1045, 105 S.Ct. 2062, 85 L.Ed.2d 336 (1985); Trushin v. State, 425 So.2d 1126 (Fla. 1982). However, we note that we have expressly held that Florida's capital sentencing scheme does not require that the jury make express findings in aggravation, and the United States Supreme Court has agreed with our holding. See Hildwin v. State, 531 So.2d 124 (Fla. 1988), affirmed, ___ U.S. ___, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989); Provenzano v. State, 497 So.2d 1177 (Fla. 1986), cert. denied, 481 U.S. 1024, 107 S.Ct. 1912, 95 L.Ed.2d 518 (1987); Spaziano v. State, 433 So.2d 508 (Fla. 1983), affirmed, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984).
Ventura's second claim regarding the manner in which the death penalty is applied in Florida is also without merit. It was not presented to the trial court before being raised on appeal and is procedurally barred. See, e.g., Swafford; Eutzy; Trushin.
Accordingly, we affirm Peter Ventura's conviction for first-degree murder and the sentence of death imposed by the trial court.
It is so ordered.
EHRLICH, C.J., and McDONALD, SHAW, BARKETT and GRIMES, JJ., concur.
OVERTON, J., concurs specially with an opinion, in which McDONALD, J., concurs.
KOGAN, J., concurs in result only with conviction and concurs with the sentence.
OVERTON, Justice, specially concurring.
I concur but would prefer to conclusively address in the initial appeal all ineffective assistance of counsel claims known at the time of that proceeding. If there are issues which we find require an evidentiary hearing, we should relinquish jurisdiction for that purpose and then dispose of the entire matter. I believe that if we consider ineffective assistance of counsel claims in this manner, we would provide a more efficient *222 process without eliminating a defendant's right to assert this type of claim.
McDONALD, J., concurs.
NOTES
[*] Wright received a sentence of life imprisonment for his role in the murder, State v. Wright, No. 87-5320-CFAES (Fla. 7th Cir.Ct. Mar. 6, 1990), and his appeal is pending in the Fifth District Court of Appeal, Wright v. State, No. 90-528 (Fla. 5th DCA filed Mar. 13, 1990).