794 So.2d 553 (2001)
Peter VENTURA, Appellant,
v.
STATE of Florida, Appellee.
Peter Ventura, Petitioner,
v.
Michael W. Moore, etc., et al., Respondents.
Nos. SC93839, SC00-583.
Supreme Court of Florida.
May 24, 2001.
Rehearing Denied September 5, 2001.
*558 Mark S. Gruber, Assistant CCRC-Middle, Office of the Capital Collateral Regional Counsel, Tampa, FL, for Appellant/Petitioner.
Robert A. Butterworth, Attorney General, and Judy Taylor Rush, Assistant Attorney General, Daytona Beach, FL, for Appellee/Respondent.
PER CURIAM.
Peter Ventura, an inmate under sentence of death, appeals an order entered by the trial court denying his motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850 and petitions this Court for a writ of habeas corpus. We have jurisdiction. Art. V, § 3(b)(1),(9), Fla. Const. For the reasons that follow we affirm the denial of Ventura's postconviction motion and deny the petition for habeas corpus.

PROCEEDINGS TO DATE
In 1988, Ventura was convicted of the first-degree murder of Robert Clemente. The facts of the murder are set forth in greater detail in Ventura v. State, 560 So.2d 217 (Fla.1990). In brief, the evidence established that Jerry Wright held a keyman insurance policy on the victim. Wright, in the midst of financial trouble, asked Jack McDonald to find someone to murder Clemente in exchange for a split of the insurance proceeds. McDonald, familiar with Ventura as a result of their dealings in a bank fraud scheme in Chicago, approached Ventura with the plan, and Ventura agreed to murder the victim. After several meetings, Ventura and McDonald arranged to commit the murder in an abandoned gravel pit off of Route 44 in DeLand, Florida.
On April 15, 1981, Ventura called Clemente, who worked at a marina as a boat salesman, under the guise of purchasing a boat and arranged to meet Clemente outside a Barnett Bank in DeLand. McDonald watched Ventura meet Clemente and then followed the two in his truck, observing Ventura and Clemente drive off into the aforementioned gravel pit. After about ten minutes, Ventura returned to McDonald's truck and commented that it had been more difficult than he had anticipated. Clemente's body was found in his truck off of Route 44 later that afternoon. Three bullets were recovered from Clemente's body, the fatal wound being a bullet to the heart.
Ventura was arrested in Chicago on June 25, 1981, for the murder of Clemente. McDonald was arrested on that same date. While awaiting extradition to Florida, Ventura was allowed to bond out of jail on July 27, 1981, and failed to appear for an extradition hearing on August 18, 1981. McDonald, who was in a Volusia County jail awaiting trial when Ventura disappeared, was discharged on speedy trial grounds on December 22, 1981, after the state was unable to proceed without Ventura. See State v. McDonald, 425 So.2d 1380 (Fla. 5th DCA 1983). Thereafter, in 1983 McDonald was sentenced in federal court to three consecutive five-year sentences for his involvement in the bank fraud scheme in Chicago. McDonald jumped bail after he was sentenced and was finally rearrested in September of 1987. Ventura remained a fugitive until June 11, 1986, when he was arrested in Austin, Texas. He was brought to trial in January of 1988.[1]
On March 2, 1992, Ventura filed his initial 3.850 motion. In that motion Ventura *559 claimed that he was unable to file a proper postconviction motion because several agencies had not complied with his public records requests. Accordingly, Ventura simply listed in his motion the claims he intended to raise once his public records requests were satisfied. The trial court dismissed all of Ventura's claims, including several with prejudice. On appeal, this Court reversed the trial court's dismissal as premature and directed the trial court to allow Ventura to amend his original 3.850 motion once all the public records issues had been resolved. Ventura v. State, 673 So.2d 479, 481 (Fla.1996).
Pursuant to this Court's order, the trial court held an evidentiary hearing on the public records claims on June 19, 1996, and entered an order on that same date finding that Ventura's requests had been fully complied with. Thereafter, Ventura filed the instant 3.850 motion on August 16, 1996, raising fifteen issues.[2] The trial court held a Huff[3] hearing on April 2, 1998, summarily denying ten of Ventura's claims, and denying the remaining claims after holding an evidentiary hearing.[4]
Ventura now appeals the denial of his postconviction motion, raising nine issues.

3.850 APPEAL
Of Ventura's nine claims, only three warrant discussion.[5] We find the remaining claims procedurally barred[6] or *560 without merit.[7]

BRADY/GIGLIO CLAIM
After holding an evidentiary hearing on Ventura's Brady/Giglio claim, the trial court denied Ventura relief, holding that there was no reasonable probability that the result of Ventura's trial would have been different given the overwhelming evidence establishing Ventura's guilt. While we hold the prejudice standard applied by the trial court erroneous, we nevertheless conclude that the error was harmless.
At the evidentiary hearing Ventura introduced a series of letters documenting conversations between Assistant State Attorney Lewis Stark and Alan Grossman of the U.S. Attorney's Office. The first letter, sent to Grossman while McDonald was still at large, was dated December 19, 1986, and was sent by Stark, who handled Ventura's prosecution. In the letter, Stark emphasized the importance of McDonald's testimony in the prosecution of Ventura. In the letter, Stark wrote: "I feel that the interests of justice could be better served by having Mr. McDonald on lengthy probation with a short jail term if necessary, available to testify at the trial of Peter Ventura and possibly Jerry Wright (in the event he is indicted). I would appreciate any consideration your office could give in the effort to locate Jack McDonald or coax him out of hiding."
Grossman responded to this letter on March 6, 1987, indicating that McDonald's sentence could not be reduced by the sentencing court for jurisdictional reasons. The letter, however, advised the State that after McDonald surrendered, any cooperation and truthful testimony on his behalf in Ventura's trial could be presented by the State at his first parole hearing. Grossman further indicated that the U.S. Attorney's office would consider McDonald's "cooperation and truthful testimony in evaluating whether to pursue further prosecution of Mr. McDonald on bond jumping charges."
On September 25, 1987, after McDonald was taken into custody by federal authorities two days earlier, Stark sent a letter to *561 the U.S. Attorney's office "formally request[ing]... dismiss[al][of] the bond jumping charges against McDonald." Stark indicated that Ventura's trial was scheduled for October 12, 1987, and that "McDonald's cooperation [was] essential."
The U.S. Attorney's Office responded to Stark's request in an October 5, 1987, letter, agreeing not to pursue federal bond jumping charges against McDonald contingent upon his full cooperation with the State. The letter further noted, "[T]his agreement does not affect Mr. McDonald's obligation to serve the federal sentence which has been imposed for his prior criminal conduct in this District."
The remaining letters introduced by Ventura at the evidentiary hearing, dated January 20, 1998, and October 31, 1998, were sent by Stark to the U.S. Attorney's office and chronicled the participation of McDonald in the prosecutions of Ventura and Jerry Wright and requested that consideration be given to McDonald by the federal courts for his participation in the aforementioned prosecutions. Importantly, the January 20, 1998, letter stated the following: "While there were no promises made to Mr. McDonald in return for his testimony, I feel a compelling obligation to advise you and the Court in Chicago of the assistance provided by Mr. McDonald to the State of Florida in the prosecution of those persons involved in the homicide of Robert G. Clemente on April 15, 1981."

BRADY
There are three elements of a Brady claim: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Way v. State, 760 So.2d 903, 910 (Fla.2000) (quoting Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)), cert. denied, 531 U.S. 1155, 121 S.Ct. 1104, 148 L.Ed.2d 975 (2001).
As a threshold matter, before addressing the first element of the Brady claim, it is necessary to address whether there was truly a deal between the State and McDonald. During cross-examination by the State at the evidentiary hearing, Stark testified that the only thing he told McDonald was that he would make his testimony and cooperation in the Ventura case known to the federal court:
Q. So what, if any agreement did you have with him then?
A. I told Mr. McDonald that I would make known to the federal court what he did in Florida, if he agreed to testify.
Q. With no promise that he in effect would obtain any benefit from that?
A. That's correct.
Q. And in fact you would have been readily available to testify to the federal authorities one way or another at the parole proceeding anyway.
A. That's correct.
Stark's testimony, however, is contradicted by the correspondence between him and the U.S. Attorney's office, which appears to memorialize an agreement between the federal government and the State to not prosecute McDonald on federal bond jumping charges. While there was no testimony at the evidentiary hearing conclusively indicating that the agreement not to pursue bond jumping charges was communicated to McDonald, it is unlikely that McDonald was not made aware of the deal as an incentive to cooperate and testify against Ventura. In fact, it would stretch logic to conclude otherwise given the content of the letters and the State's *562 emphasis on McDonald's pivotal role in Ventura's prosecution in its requests that the federal government refrain from prosecuting McDonald on the bond jumping charges.
This conclusion answers the first prong of the Brady analysis, as it is clear that the evidence of the agreement would have been favorable to Ventura for its impeachment value. See, e.g., Way, 760 So.2d at 910-11 (finding that suppressed photographs would have been favorable to the defendant based partly on their impeachment value).
Resolution of the second prong of Brady, whether the State suppressed the evidence willfully or inadvertently, presents a more difficult task. At the evidentiary hearing, Stark could not definitively state whether the letters between the State and the U.S. Attorney's office were disclosed to Ventura. While Stark claimed that his office maintained an "open-file policy" in which they would make their file available to the defense, he could not recall if in fact the letters in question were part of this "open file."[8] Ventura's trial counsel, Ray Cass, testified that he did not recall being provided the letters and that if he had received them he would have utilized them to impeach McDonald. With this evidentiary backdrop, it is unclear whether the State disclosed the letters or their substance to Ventura. Nevertheless, the question of whether the State suppressed the evidence under Brady appears academic given Ventura's Giglio claim, an analysis of which follows.

GIGLIO
At Ventura's trial, McDonald testified on direct as follows:
Q. Any promises been made to you concerning your testimony here?
A. None whatsoever.
On redirect, McDonald further testified:
Q. What is your motivation for testifying here today?
A. Well, I'm nearing sixty years of age. This is probably, undoubtedly the most horrendous thing I have ever been involved in, and I think it is about time we cleared the air and it might give Mr. and Mrs. Clemente a little peace of mind knowing what exactly happened.
Giglio stands for the proposition that a prosecutor "has a duty to correct testimony he or she knows is false when a witness conceals bias against the defendant through that false testimony." Routly v. State, 590 So.2d 397, 400 (Fla.1991).
To establish a violation of Giglio Ventura must show: "(1) that the testimony was false; (2) that the prosecutor knew the testimony was false; and (3) that the statement was material." Robinson v. State, 707 So.2d 688, 693 (Fla.1998); see Craig v. State, 685 So.2d 1224, 1227 (Fla. 1996); Routly, 590 So.2d at 400. Further, we have repeatedly emphasized that "[t]he thrust of Giglio and its progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony, and the prosecutor not fraudulently conceal such facts from the jury." Robinson, 707 So.2d at 693 (quoting Routly, 590 So.2d at 400); see Craig, 685 So.2d at 1226-27.
Given our conclusion as to the deal between the State and McDonald, it is clear that McDonald's testimony to the effect that no promises were made to him in exchange for his testimony was false. Indeed, *563 this conclusion satisfies the second prong of Giglio in the instant case, as it was prosecutor Stark who wrote the letters to the U.S. Attorney's office seeking favorable treatment for McDonald.
In defense of Stark, the State argues that it is plausible that Stark (and McDonald for that matter) did not consider the testimony to be false given the uncertainty and marginal nature of the deal. First, the State claims that it had no control over the federal government's decision on whether to prosecute McDonald on the bond jumping charges. Second, such a promise was not a significant consideration because the deal conferred a marginal benefit upon McDonald.
While the State raises these arguments in defense of the second prong of Giglio, the State's arguments are more appropriately addressed under the materiality prong. In denying Ventura's claim, the trial court incorrectly relied on the materiality standard appropriate to Brady claims. See United States v. Alzate, 47 F.3d 1103, 1109-10 (11th Cir.1995) ("Where there has been a suppression of favorable evidence in violation of Brady v. Maryland, the nondisclosed evidence is material: `if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' ... A different and more defense-friendly standard of materiality applies where the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony.") (citations omitted). Under Giglio, a statement is material if "there is a reasonable probability that the false evidence may have affected the judgment of the jury...." Routly, 590 So.2d at 400. "In analyzing this issue... courts must focus on whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict." White v. State, 729 So.2d 909, 913 (Fla.1999).
Returning to the State's claims that the agreement lacked any significance, in Tarver v. Hopper, 169 F.3d 710 (11th Cir. 1999), the Eleventh Circuit affirmed the denial of the petitioner's habeas petition with regards to his Giglio claim partly because the alleged undisclosed promise made to the government's witness was too marginal for the witness to consider:
[N]ot everything said to a witness or to his lawyer must be disclosed. For example, a promise to "speak a word" on the witness's behalf does not need to be disclosed. Likewise, a prosecutor's statement that he would "take care" of the witness does not need to be disclosed. Some promises, agreements, or understandings do not need to be disclosed because they are too ambiguous, or too loose or are of too marginal a benefit to the witness to count.
169 F.3d at 717 (citations omitted). The prosecutor in Tarver purportedly promised the witness, the defendant's associate, that his cooperation would be taken into consideration. While that "promise" guaranteed nothing tangible to the witness, the same cannot be said of the promise in the instant case. Stark obtained an agreement from the U.S. Attorney's office that McDonald would not be prosecuted on federal bond jumping charges. This tangible benefit is clearly distinguishable from the ambiguous, loose, and marginal benefit "promised" in Tarver. Cf. Seiber v. Coyle, 156 F.3d 1232 (6th Cir.1998) (unpublished table decision) (holding statements made from investigating detective to inmate witness to the effect that "he would help him if he could" too marginal to grant relief under Giglio, but holding otherwise as to a promise from the prosecutor's office that *564 in return for his testimony he would be transferred to another jurisdiction).
Nevertheless, Giglio's materiality analysis requires this Court to consider what additional areas of impeachment, if any, the evidence of the deal would have afforded Ventura. The deal's impeachment value, however, must be measured in relation to the importance of McDonald to the State's case. On the record of Ventura's trial, it is apparent that McDonald was the State's key witness. In fact, this Court characterized McDonald as the State's "key witness" on direct appeal. Ventura, 560 So.2d at 218. He was the one witness who provided the direct link connecting Ventura to the murder.
That being said, McDonald was significantly impeached at trial in several respects. First, McDonald was impeached by defense counsel with evidence of his two felony convictions for bank fraud.[9] Second, McDonald was impeached with the implication that McDonald harbored bitterness towards Ventura as a result of his conviction for the bank fraud scheme he was involved in with Ventura and Joseph Pike, a friend of Ventura who testified at trial. The following is a portion of the cross-examination on the issue:
Q. I would ask you, sir, did you or did you not have some feeling of rancor towards Mr. Ventura as a result of the Federal bank scam that resulted in your conviction?
A. None whatsoever.
Q. You didn't feel that perhaps it was one of his people that had blown the whistle on you, like Mr. Pike?
A. In that type of business, it's a calculated risk. If somebody turns over on you, they turn over on you.
Q. But it really doesn't bother you one way or the other?
A. No because he wasn't the only one.
Third, and perhaps most importantly, McDonald was impeached with a statement he made in a deposition taken by Stark in which McDonald testified, contrary to his testimony at trial, that he was not with Ventura the day of the murder, but instead had arranged for Ventura to call him once Ventura had murdered the victim. McDonald, when confronted with the inconsistent statement during cross, admitted to lying at the deposition:
Q. I suggest to you, sir, and would not object to an explanation, that this [deposition] indicated that you were not with Mr. Ventura at the time Mr. Clemente was killed.
A. I would also suggest that the deposition was not signed by me.
. . . .
Q. I'd ask you, sir, whether or not the reporter asked you to raise your right hand, and asked you to swear to tell the truth, the whole truth, and nothing but the truth?
A. Yes.
Q. And did you do that?
A. Not in that particular case, I did not.
Q. You were not sworn?
A. No, I did not tell the truth.
Defense counsel further elicited during cross that at the time of the deposition McDonald was aware that he could not face prosecution for the murder, thereby negating any obvious motive for McDonald to lie at the deposition.[10]
*565 In addition to being significantly impeached, McDonald's detailed testimony regarding the planning of the murder was extensively corroborated by the introduction of several hotel registration cards confirming McDonald's accounts of meetings with Ventura. Similar corroboration was obtained through the testimony of Reginald Barrett, a friend of Ventura. Further, Ventura's role as the killer was substantiated by the testimony of Pike, Barrett, and Timothy Arview, all of whom recounted admissions by Ventura to his role in the murder scheme. Accordingly, based on this record of ample impeachment and corroboration, we hold the evidence of the deal immaterial under Giglio. Cf. White, 729 So.2d at 913 (affirming trial court's denial of defendant's Giglio claim, holding the additional evidence of a deal between the State and a witness immaterial where the defense was able to expose the major components of the deal during cross); Routly, 590 So.2d at 400 (holding that additional evidence of a deal between the State and its key witness was not material where cross-examination exposed that the witness was granted immunity by the State but not every "provision of her immunity agreement."); see United States v. Petrillo, 821 F.2d 85, 90 (2nd Cir.1987) (finding no violation of Giglio where the key aspects of the witness's testimony were corroborated by other testimony).

INEFFECTIVENESS CLAIMS
After holding an evidentiary hearing on Ventura's claims of ineffective assistance of counsel, the trial court denied all of Ventura's claims, concluding that he failed to establish deficient performance on the part of counsel or prejudice arising therefrom. We will address Ventura's ineffectiveness claims relating to his representation during the guilt phase first.
Ventura claims ineffectiveness during the guilt phase, alleging failure to investigate, failure to cross-examine, disclosure of criminal record during voir dire, failure to object, ineffective voir dire, and jury selection. We find no error in the trial court's disposition of these claims.
To establish a claim of ineffective assistance of counsel, a defendant must satisfy two elements:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also State v. Riechmann, 777 So.2d 342 (Fla.2000); Downs v. State, 740 So.2d 506, 515 (Fla.1999); Rutherford v. State, 727 So.2d 216, 219 (Fla.1998).
Ventura claims ineffectiveness in counsel's failure to investigate and present the testimony of the victim's wife, Tina Clemente. Tina Clemente testified at co-defendant Jerry Wright's trial that the victim introduced her to an individual named Peter Ventura briefly on two occasions. She further testified that her husband had a message on their answering machine to meet a man named Alex Martin and that her husband appeared very nervous about the meeting. Ventura claims that this evidence, that the victim *566 knew Peter Ventura, is inconsistent with the theory that Ventura set up the meeting with Clemente under the alias "Alex Martin."
At Ventura's trial, Denise Jorgenson, co-owner of the Crow's Bluff Marina, where the victim was employed, was called by the State and testified that the victim told her that the person he was to meet at Barnett Bank was named Alex Martin. Jorgenson testified that she was under the impression that Clemente had never met this individual before. The evidence at trial supported the conclusion that Ventura made the call to the victim and used the alias "Alex Martin" to set up the meeting behind the bank. The fact that the victim may have known Ventura does not make it more or less likely that Ventura placed the call to set up the meeting. Further, Ventura's use of an alias to set up the meeting was consistent with the evidence at trial that Ventura used aliases and was in fact using one when he was arrested. Moreover, the evidence to be inferred from Tina Clemente's testimony, i.e., that the victim knew Ventura, would appear to buttress McDonald's testimony that the victim met Ventura behind the bank and allowed Ventura to ride in his truck. Accordingly, we conclude that counsel's performance was not deficient, but even if we found it to be deficient Ventura has not established any prejudice flowing therefrom. See Torres-Arboleda v. Dugger, 636 So.2d 1321, 1324 (Fla.1994) (finding that although failure to investigate the defendant's alibi defense may have constituted deficient performance, the defendant was not prejudiced thereby because there was substantial evidence introduced at trial contradicting the alibi testimony offered by the defendant at his evidentiary hearing).
Ventura next claims ineffectiveness in counsel's cross-examination of Juan Gonzalez and Timothy Arview. We find this claim to be wholly without merit.
At trial, Juan Gonzalez of the Austin, Texas, Police Department testified that Timothy Arview walked into the Austin police station on June 7, 1986, and indicated that Ventura (at the time using the name "Juan Contras") was living in Austin and was wanted in Florida and Chicago for a homicide. Ventura claims that defense counsel, who did not cross-examine Gonzalez, should have emphasized the discrepancy between Gonzalez's testimony and that of Arview, who testified that Ventura admitted to murdering someone in Florida. In context, it appears that the State's examination of Gonzalez was structured so as to avoid any hearsay objections. Accordingly, Gonzalez spoke in general terms of the information received from Arview leading to Ventura's arrest to demonstrate the progress of the investigation. Viewed in this light, there really was no discrepancy for counsel to highlight in cross-examining Gonzalez. Moreover, any inquiry into a "discrepancy" between Gonzalez's trial testimony and that of Arview would have invited inadmissible hearsay testimony from Gonzalez, which would have corroborated Arview's testimony that Ventura admitted to committing a murder in Florida. Counsel's performance can hardly be characterized as deficient in this regard.
As to the cross-examination of Arview, Ventura claims that defense counsel merely "went through the motions." After reviewing the record, it is apparent that Ventura is taking issue with the manner in which counsel conducted Arview's cross-examination rather than its substance.
During cross-examination of Arview, defense counsel impeached Arview as to a disagreement Arview had with Ventura regarding money owed to him by Ventura and his motivation to receive reward money *567 in coming forward and implicating Ventura. Ventura claims that counsel's cross would have been more effective if counsel had made specific reference to a transcript of an interview between Arview and a Volusia County detective. The transcript, however, contained substantially the same grounds of impeachment that counsel was able to develop on cross. In sum, the impeaching material from the interview which was not utilized by defense counsel can only be described as cumulative. See State v. Riechmann, 777 So.2d at 356 ("[F]ailing to present cumulative impeachment evidence does not necessarily constitute ineffective assistance"); Valle v. State, 705 So.2d 1331, 1334-35 (Fla.1997) (affirming trial court's finding that defendant's claim of ineffectiveness in counsel's failure to present additional mitigating evidence was insufficient where the evidence would have been cumulative); Provenzano v. Dugger, 561 So.2d 541, 546 (Fla.1990) (holding that defendant failed to establish prejudice in his claim that counsel was ineffective for failing to present additional mitigating evidence where the additional evidence was largely cumulative); Card v. State, 497 So.2d 1169, 1176 (Fla.1986) (affirming the denial of defendant's claim that counsel was ineffective for failing to obtain and use various forms of exculpatory and impeaching evidence, holding that a great deal of the evidence was actually presented "just not in the manner appellate counsel feels was most effective.").
In his next claim, Ventura argues that counsel was ineffective in disclosing to the jury venire during voir dire that he was a convicted felon. Ventura argues that any evidence of Ventura's felony convictions would have been inadmissible because Ventura did not testify.
At the evidentiary hearing defense counsel inconsistently explained his decision to disclose Ventura's criminal record to the jury venire, admitting error in his decision in one instance and explaining his decision as a matter of strategy in another. The record of the evidentiary hearing makes clear that counsel's inconsistent explanations were the product of the fading memory of a case that he tried ten years prior. When counsel's testimony at the evidentiary hearing is read in conjunction with the trial record, it is apparent that defense counsel disclosed Ventura's record to the jury in furtherance of a strategy to demonstrate that Ventura was being framed for the murder by McDonald.
To establish McDonald's motivation for doing so, defense counsel developed the criminal relationship of McDonald and Ventura arising from their involvement in a bank fraud scheme. Counsel's cross-examination of McDonald was dedicated to raising the implication that McDonald harbored bitterness towards Ventura from their dealings in the bank fraud scheme, which resulted in McDonald's conviction and fifteen-year sentence. During the testimony of Joseph Pike, defense counsel questioned Pike concerning his involvement in the bank scheme and McDonald's potential animosity towards him stemming from his cooperation with the authorities during the investigation of the scheme. The defense further elicited testimony from Pike that McDonald was the key player in the bank fraud scheme. Additionally, the defense elicited testimony from Reginald Barrett, who testified that Ventura had confided in him that he was fearful of McDonald. This line of examination was devoted to the defense strategy of implying that both Pike and Barrett had reason to fear McDonald and implicate Ventura as the murderer rather than McDonald. Counsel's closing argument was similarly focused.
Accordingly, we find no deficiency in counsel's decision to disclose Ventura's *568 criminal record during voir dire, as counsel did so in anticipation of his strategy to uncover a motive for McDonald, Pike, and Barrett to implicate Ventura as the murderer. See Andrews v. Cain, 71 F.Supp.2d 560, 568 (E.D.La.1999) (holding that counsel's decision to disclose defendant's criminal record to the jury during voir dire was a "strategic decision to uncover any bias and ensure an impartial jury"); State v. Byrd, 815 S.W.2d 103, 105 (Mo.Ct.App. 1991) (denying defendant's claim that counsel was ineffective for disclosing his prior convictions to the jury in voir dire where defendant's criminal record was relevant to his alibi defense); see also Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("Because of the difficulties inherent in making the evaluation [of ineffectiveness], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'").
We next briefly address Ventura's claim of ineffectiveness stemming from counsel's failure to raise several hearsay objections during the testimony of several witnesses. We find the claims to be without merit as the complained of hearsay contained testimony which was properly admitted through the testimony of several other state witnesses. See United States v. Brooks, 82 F.3d 50, 53 (2nd Cir.1996) (holding that defendant established no prejudice from counsel's failure to object to hearsay testimony where the hearsay contained facts which were already testified to in admissible form). Ventura also claims ineffectiveness in counsel's failure to object to the statements of McDonald, Pike, and Barrett, among others, as to Ventura's involvement in the bank scheme. As discussed earlier, counsel's failure to object appears to have been a reasonable tactical decision given the strategy pursued by defense counsel.
As his final claim of ineffectiveness during the guilt phase, Ventura argues that counsel was deficient in failing to challenge for cause two jurors and stipulating to cause challenges as to two others.
Ventura maintains that jurors Kirby and Dixon should have been challenged for cause by defense counsel because they both indicated a predisposition to recommend the death penalty. After reviewing the record of voir dire, we find no merit to Ventura's contention. At worst the answers of jurors Kirby and Dixon can be described as equivocal, as both indicated that they would not automatically recommend death or life regardless of the evidence in aggravation and mitigation. Moreover, it appears that the answers provided by Kirby and Dixon which Ventura claims illustrates their predisposition to recommend the death penalty were the product of confusingly phrased questions.
Ventura's ineffectiveness claims as to jurors Hopkins and Burdick are likewise without merit.
The record reveals that juror Hopkins, a minister, repeatedly indicated that he would have reservations about returning a guilty verdict knowing that the death penalty could be imposed given his religious beliefs. The best Hopkins could offer in response to whether he could return a guilty verdict knowing the death penalty was a possibility was, "I think I could." Based on the foregoing the trial court concluded:
As to juror Hopkins, the Court agrees that Mr. Hopkins was somewhat across the boards in his responses at times stating specifically that his opposition to *569 the death penalty would affect his ability to fairly evaluate the evidence and follow the law and at other times, he indicated he would try to follow the law and not let his opposition to the death penalty interfere.
But a further review of the trial transcript indicates that the defense attorney may have applied strategy in not objecting to Mr. Hopkins being excused for cause rather than using one of defendant's peremptory challenges against Mr. Hopkins.... Mr. Hopkins clearly indicated that he would give greater weight to the testimony of a police officer simply because he was a police officer.
The trial court's conclusions are borne out by the record. Finally, juror Burdick, like Hopkins, expressed reservations about the death penalty and made it clear to the court that she did not feel she could return a guilty verdict knowing that the death penalty was a possibility. Accordingly, the trial court similarly denied Ventura's claim as to juror Burdick, stating:
[T]he trial transcript indicates that she clearly indicated her objections to the death penalty would affect her ability to return a verdict of guilty if the evidence warranted.... With Ms. Burdick's strong statements, the challenge for cause was proper and the defense attorney was not unreasonable in not objecting to same.
We find no error in the trial court's conclusion. See Maxwell v. Wainwright, 490 So.2d 927, 930 (Fla.1986) (affirming summary denial of defendant's postconviction claim that juror who merely expressed hesitancy about the use of capital punishment was improperly excused for cause as procedurally barred, but noting, "[m]oreover, under established Florida law, the juror was properly excused because, based on the record of the original trial, it was clear that the possibility of a death sentence rendered the juror unable to impartially participate in the determination of guilt or innocence."); Palmes v. State, 425 So.2d 4, 7 (Fla.1983) (denying defendant's ineffectiveness claim based on counsel's failure to object to the dismissal of several prospective jurors for cause who expressed views in opposition of the death penalty, holding no substantial deficiency in this regard where the "excusals were not objected to because they were not legally objectionable"); see also Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (The standard for determining whether a prospective juror may be excused for cause because of his or her views of the death penalty is whether the prospective juror's views would "prevent or substantially impair the performance of his or her duties as a juror in accordance with the juror's instructions or oath."); San Martin v. State, 717 So.2d 462, 468 (Fla.1998); Kimbrough v. State, 700 So.2d 634, 638-39 (Fla.1997);
In his only claim of ineffectiveness during the penalty phase, Ventura argues that counsel was ineffective in failing to investigate and present additional mitigating evidence.
During Ventura's penalty phase defense counsel produced three witnesses who described Ventura as extremely religious, hard-working, and a good family man. At the evidentiary hearing, Ventura produced six siblings and a minister, all of whom testified that they would have been available to testify at the penalty phase had they been contacted.
For Ventura to succeed in his claim, he "must demonstrate that counsel's performance was deficient and that counsel's deficient performance affected the outcome of the sentencing proceedings." Hildwin v. Dugger, 654 So.2d 107, 109 (Fla.1995). Accordingly, Ventura "must *570 demonstrate that but for counsel's errors he would have probably received a life sentence." Id.
The evidence introduced at the evidentiary hearing supports Ventura's claim that defense counsel did not conduct an adequate investigation into his background. "An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." Rose v. State, 675 So.2d 567, 571(Fla.1996) (quoting Porter v. Singletary, 14 F.3d 554, 557 (11th Cir.1994)). Counsel indicated that Ventura was the sole source he relied on for mitigating evidence. Further, although Ventura testified at the hearing that he did not want his family involved at the trial, defense counsel did not indicate that Ventura prevented him from contacting Ventura's family. See State v. Riechmann, 777 So.2d 342 (Fla.2000) (affirming trial court's determination that defense counsel was deficient where evidence suggested that German defendant did not want counsel to go to Germany, but "defense counsel conceded that Riechmann did not instruct him or preclude him from investigating or presenting mitigating evidence," including testimony from individuals living in Germany who knew the defendant); cf. Rutherford v. State, 727 So.2d 216, 225 (Fla.1998) (affirming trial court's denial of ineffectiveness claims where the defendant refused to help counsel develop mitigation by encouraging his parents not to speak with defense investigators regarding his childhood and hindered defense counsel's investigation of his military background). Moreover, counsel made clear during the evidentiary hearing that his failure to call other members of Ventura's family during the penalty phase was not a matter of strategy. We therefore conclude that counsel's investigation was indeed deficient. However, we agree with the trial court's conclusion that Ventura failed to establish any prejudice flowing from counsel's deficient performance:
This Court finds that the witnesses called by Mr. Cass at the penalty phase covered the same matters [as] the witnesses the defendant presented during the evidentiary hearing and that had these additional witnesses been called they would have had nothing additional to add beyond those actually testifying before the jury in the penalty phase and that there is no reasonable probability that the result would have been different.
The testimony of the witnesses produced at the evidentiary hearing mirrored that of the witnesses who testified during Ventura's penalty phase: Ventura was a good family man, very religious, and a hard worker. Accordingly, we find no error in the trial court's denial of this claim as Ventura failed to establish any prejudice from counsel's deficient investigation. See Downs v. State, 740 So.2d 506, 516 (Fla. 1999) (affirming trial court's denial of defendant's claims that counsel was ineffective for failing to investigate and present additional mitigating evidence where the additional evidence was cumulative to that presented during sentencing); Rutherford, 727 So.2d at 224-25 (same); Valle, 705 So.2d at 1334-35 (same).

NEWLY DISCOVERED EVIDENCE
Ventura claims that codefendant's Jerry Wright's life sentence is cognizable as newly discovered evidence to address the issue of proportionality.
For evidence to be considered newly discovered and sufficient to set aside a conviction, two requirements must be met:
First, in order to be considered newly discovered, the evidence "must have been unknown by the trial court, by the *571 party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence."
Second, the newly discovered evidence must be of such a nature that it would probably produce an acquittal on retrial.
Jones v. State, 709 So.2d 512, 521 (Fla. 1998) (citation omitted). The two elements of a newly discovered evidence claim apply equally to the issue of "whether a life or death sentence should have been imposed." Scott v. Dugger, 604 So.2d 465, 468 (Fla. 1992). Specifically, for a defendant to succeed on a claim that a death sentence must be set aside because of a codefendant's subsequent life sentence the defendant must show: "1) the life sentence could not have been known to the parties by the use of due diligence at the time of trial; and 2) the codefendant's life sentence would probably result in a life sentence for the defendant on retrial." Groover v. State, 703 So.2d 1035, 1037 (Fla.1997) (citing Scott v. Dugger, 604 So.2d at 468).
Ventura meets the first requirement, as Jerry Wright's life sentence was affirmed by the First District roughly a year after this Court affirmed Ventura's conviction and death sentence in 1990. See Wright v. State, 585 So.2d 321 (Fla. 5th DCA 1991), approved, 596 So.2d 456 (Fla.1992); Ventura, 560 So.2d at 221 (1990). Ventura, however, fails to meet the second prong of the newly discovered evidence test.
The evidence at Ventura's trial established that Wright, through McDonald, hired Ventura to kill the victim to receive the proceeds from a keyman insurance policy held by Wright on the victim. Moreover, the evidence established that Ventura was the triggerman in the scheme. Accordingly, Ventura is not entitled to relief as he and Wright are not equally culpable codefendants. See Groover, 703 So.2d at 1037 (affirming denial of defendant's postconviction claim that codefendant's life sentence constituted newly discovered evidence where the trial court concluded that the codefendants were not equally culpable where the defendant was the actual triggerman); see also Johnson v. State, 696 So.2d 317, 326 (Fla.1997) (denying defendant's claim on direct appeal that death sentence was disproportionate in light of codefendant's life sentence where the defendant was the triggerman and the leader of the attack against the victims); Garcia v. State, 492 So.2d 360, 368 (Fla.1986) (denying defendant's claim on direct appeal that death sentence was disproportionate in light of codefendants' life sentences where the evidence against the defendant included an admission that he was the triggerman).

HABEAS CORPUS
Ventura raises five claims of ineffective assistance of appellate counsel in his petition for habeas corpus.[11] We deny Ventura's claims as wholly without merit.[12]
*572 Accordingly, we affirm the trial court's denial of Ventura's 3.850 motion and deny the petition for habeas corpus.
It is so ordered.
WELLS, C.J., SHAW, HARDING, and LEWIS, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which PARIENTE and QUINCE, JJ., concur.
ANSTEAD, J., concurring in part and dissenting in part.
Although I agree almost entirely with the majority's analysis of the Giglio issue, I cannot concur in its analysis of the materiality element and its conclusion that no prejudice has been demonstrated by the deception that occurred here. I am further concerned because of the complete absence of any comment or analysis of this issue in the trial court's order denying relief. In short, there is no trial court analysis or finding to review.
As the majority opinion makes clear, there is undisputed evidence that the prosecutor brokered a deal between the State's key witness, Jack McDonald, and the U.S. Attorney's Office in exchange for McDonald's cooperation and testimony against Ventura. The letter confirming the deal sent by the U.S. Attorney expressly warns that charges would be pursued in McDonald's case if he did not cooperate with the State:
Pursuant to your request, my office will not pursue bond-jumping charges against Jack McDonald as long as he cooperates fully with your office in the upcoming murder case referred to in *573 your letter of September 25, 1987. Should Mr. McDonald fail to testify truthfully in that case or in some other way fail to cooperate with your office, we will then be free to pursue bond-jumping charges.
However, at trial the prosecutor elicited testimony from McDonald that he had received no deals "whatsoever" and that his only motivation for testifying was remorse and a desire to provide closure to the victim's family. Further, in the undisclosed correspondence with the federal authorities, the prosecutor described McDonald as a "crucial witness" whose "cooperation is essential." The record also supports the prosecutor's characterization of McDonald's importance as the State's key witness against Ventura.[13] Indeed, this Court characterized McDonald as the State's "key witness" in its opinion on Ventura's direct appeal. See Ventura, 560 So.2d at 218.

Materiality and Prejudice
The Giglio standard for materiality was explained by this Court in Routly v. State, 590 So.2d 397 (Fla.1991):
If there is a reasonable probability that the false evidence may have affected the judgment of the jury, a new trial is required. Giglio, 405 U.S. at 154, 92 S.Ct. at 766 (quoting Napue v. Illinois, 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959)). "The thrust of Giglio and its progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony, and that the prosecutor not fraudulently conceal such facts from the jury." Smith v. Kemp, 715 F.2d 1459, 1467 (11th Cir.), cert. denied, 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699 (1983).
Id. at 400.[14] This standard for materiality has clearly been met here. Further, this Court and the federal courts, have considered and rejected the analysis of materiality adopted by the majority today. For example, the court pointedly noted in United States v. Sanfilippo, 564 F.2d 176 (5th Cir.1977):
The Government argues that Mori's prior convictions sufficiently impeached his credibility so that the plea agreement would add nothing. The fact that the history of a witness shows that he might be dishonest does not render cumulative evidence that the prosecution promised immunity for testimony. A jury may very well give great weight to a precise reason to doubt credibility when the witness has been shown to be the kind of person who might perjure himself. Had the jury known of the Government's promise regarding the Ellswick case, conditioned as it was on Mori's testifying against Sanfilippo, it might well have reached a different decision as to whether Mori had fabricated *574 testimony in order to protect himself against another criminal prosecution.
Id. at 178. Similarly, the Eleventh Circuit has explained:
This is not a case in which the witness' bias becomes irrelevant because the witness' testimony is fully corroborated, nor is this a case in which the witness' testimony has been thoroughly impeached and proof of his bias would be merely cumulative. See, e.g., McCleskey v. Kemp, 753 F.2d 877, 885 (11th Cir.1985) (en banc), aff'd 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); United States v. Antone, 603 F.2d 566, 571 (5th Cir.1979). Rather, as in Napue and Giglio, the Government's case against the accused turned on the testimony of a single witness, Ream. We have stated that the prosecutor's failure to correct a witness' false testimony will warrant a reversal where, as here, the "estimate of the truthfulness and reliability of the given witness may well be determinative of guilt or innocence." United States v. Cole, 755 F.2d 748, 763 (11th Cir.1985) (citations omitted). We acknowledge that Ream's credibility had been eroded due to the testimony the defense elicited from him on cross-examination. The disclosure of Ream's conversation with Miller, however, would not have been merely repetitious, reinforcing a fact that the jury already knew; instead, "the truth would have introduced a new source of potential bias." Brown v. Wainwright, 785 F.2d 1457, 1466 (11th Cir.1986). See also United States v. Sanfilippo, 564 F.2d 176, 178 (5th Cir.1977) ("A jury may very well give great weight to a precise reason to doubt credibility when the witness has been shown to be the kind of person who might perjure himself.").
United States v. Rivera Pedin, 861 F.2d 1522, 1530 (11th Cir.1988); see also Brown v. Wainwright, 785 F.2d 1457, 1466 (11th Cir.1986) ("We reject the state's contention that the false testimony was not material because it was merely cumulative of Floyd's possible bias. In the normal evidentiary sense cumulative evidence is excluded because it is repetitious. The testimony here did not merely reinforce a fact that the jury already knew; the truth would have introduced a new source of potential bias."). These cases stand for the proposition that prejudice is established where the hidden truth "would have introduced a new [and significant] source of potential bias." That is precisely the situation presented to us today. The "other" impeachment of McDonald relied upon by the majority pales in comparison to the new source of potential bias relating to the suppressed cooperation agreement.
In White v. State, 729 So.2d 909 (Fla. 1999), this Court applied the correct analysis, although under the facts there it produced a different outcome. In White, in determining that the Brady materiality test had not been met, we quoted the lower court's analysis with approval:
Defense counsel conducted an excellent cross-examination of [co-defendant] DiMarino. [Appellant's] attorney showed the jury that DiMarino had much to gain by his testimony. Defense counsel brought out that DiMarino lied when it was to his benefit, that he obtained a better sentencing deal via his testimony, that he would be kept safe from the Outlaws and that his girlfriend and child would be taken care of. Even though some of the details of the agreement were not presented to the jury, counsel more than sufficiently acquainted the jury with the fact that there was an agreement between DiMarino and the State and counsel introduced most of the agreement's major components. The additional material of which [appellant] now complains would not have *575 added to DiMarino's impeachment. Consequently, this court finds there is no reasonable probability that this evidence, if it had been presented at trial, would have changed the outcome.
Id. at 913 (emphasis supplied). Importantly, in White, the essential terms of the allegedly undisclosed cooperation agreement were brought out by counsel's cross-examination. Obviously, Ventura's counsel did not cross-examine McDonald on the issue of any agreement, and, if anything, counsel made matters worse with his questions to Inspector Berger about any deals when he received not only a false denial, but a misleading answer (considering the now-disclosed "deal") about McDonald's deep remorse and desire to "clear the air."
Two other cases from this Court, Rogers v. State, 782 So.2d 373 (Fla.2001), and Craig v. State, 685 So.2d 1224 (Fla.1996), are also helpful. In Rogers, for instance, the codefendant, Thomas McDermid, was the State's chief witness against Rogers and received pretrial coaching from the prosecution in an apparent attempt to bring his testimony in line with other State witnesses, although he had already given conflicting testimony. Evidence of the co-defendant's recorded coaching was never disclosed to Rogers, and he was found guilty. Reversing the trial court's order denying rule 3.850 relief, this Court reemphasized that where the State's case depends mainly on one witness's testimony, that witness's credibility becomes an important and material issue in the case. The Court noted that Rogers could have impeached his codefendant in this case had the recording suggesting a change in testimony been disclosed.
Craig involved a deal entered into between the State and a codefendant whereby he received two life sentences in the same murder case in exchange for his testimony against Craig. The Giglio issue involved the prosecutor's emphasis through his direct examination of the codefendant and his argument during the penalty-phase proceeding that two life sentences had been imposed and that the State would see to it that the codefendant would continue to serve those sentences. The prosecutor indicatedboth through elicited testimony and argumentthat he had consistently shown up at the codefendant's parole hearings and would continue to do so to make sure he would never be released from prison. However, the prosecutor fully knew at that time that the codefendant had already been placed in a work release program in preparation for his release from prison. Applying Giglio, the Court reversed Craig's sentence and remanded for a new proceeding based upon the prosecutor's misrepresentation of the facts to Craig's sentencing jury. See Craig, 685 So.2d at 1227-28. As demonstrated above, in both Rogers and Craig the State's cases relied heavily upon the testimony of witnesses who were also implicated in the murders at issue.

Conclusion
At issue here is not merely whether the existence of a deal with the State's key witness was disclosed and that all of the letters engineering the deal should have been disclosed. Rather, at issue is whether a completely false impression as to the motivation for testifying of the key witness for the prosecution was affirmatively advanced to the court and jury.
PARIENTE and QUINCE, JJ., concur.
NOTES
[1] Codefendant Jerry Wright was tried in February of 1990. Wright was convicted of first-degree murder and sentenced to life. His conviction and sentence were affirmed on July 25, 1991. Wright v. State, 585 So.2d 321 (Fla. 5th DCA 1991), approved, 596 So.2d 456 (Fla.1992).
[2] Ventura raised the following claims: (1) withholding of public records; (2) ineffective assistance of counsel at the pretrial and guilt phases; (3) ineffective assistance of counsel during the penalty phase; (4) violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); (5) ineffective assistance of counsel due to a conflict of interest; (6) newly discovered evidence; (7) trial judge's use of Ventura's silence to find aggravating circumstances; (8) trial court's failure to find mitigating circumstances set out in the record; (9) burden-shifting penalty-phase instructions; (10) violation of Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992); (11) trial court's use of defendant's silence and declaration of innocence during sentencing to support aggravating circumstances; (12) trial court's failure to find mitigating circumstances supported by the record; (13) burden-shifting jury instructions; (14) improper instruction and imposition of aggravating circumstances; and (15) cumulative error.
[3] Huff v. State, 495 So.2d 145 (Fla.1986).
[4] The trial court summarily denied claims one and seven through fifteen.
[5] Ventura's nine claims are: (1) Brady/Giglio error; (2) ineffective assistance of counsel at guilt and penalty phase; (3) newly discovered evidence; (4) whether trial court erred in allowing the State additional time to respond to his postconviction motion; (5) improper consideration of Ventura's silence and assertion of innocence in aggravation; (6) failure to find mitigating evidence; (7) burden-shifting penalty phase instructions; (8) Espinosa error; and (9) cumulative error.
[6] The trial court summarily denied claims five through eight as procedurally barred. We find no error in the resolution of these claims as the claims should have been raised on direct appeal. See, e.g., Downs v. State, 740 So.2d 506, 517 (Fla.1999). On appeal, Ventura attempts to circumvent the procedural bar by interjecting allegations of ineffective assistance of counsel. As we have repeatedly emphasized, such attempts are insufficient to overcome a procedural bar. See Valle v. State, 705 So.2d 1331, 1337, n. 6 (Fla.1997); Cherry v. State, 659 So.2d 1069, 1072 (Fla. 1995); Medina v. State, 573 So.2d 293, 295 (Fla.1990).

The trial court similarly denied Ventura's ninth claim alleging cumulative error. Given our resolution of the issues raised by Ventura, we find no merit to the cumulative error claim. See Bryan v. State, 748 So.2d 1003, 1008 (Fla.1999) ("[W]here allegations of individual error are found without merit, a cumulative error argument based thereon must fail."). We note, however, that the trial court summarily denied this claim prior to holding an evidentiary hearing on the remaining claims. Such prejudgment of petitioner's cumulative error claim is clearly improper.
[7] In claim four, Ventura claims that the trial court improperly enlarged the amount of time for the state to respond to his 3.850 motion. After reversing the dismissal of Ventura's initial 3.850 motion, this Court, given the delays which had plagued the proceedings as a result of difficulties with public records requests, specified a time line which provided that the State would respond to Ventura's 3.850 motion within twenty days. See Ventura, 673 So.2d at 481-82. The trial court allowed the State over five months to respond to Ventura's 3.850 motion. The State provided no reason for the delay. We agree with Ventura that under these circumstances the trial court improperly departed from this Court's instructions on remand. See Hoffman v. State, 613 So.2d 405, 406 (Fla.1992) ("When a lower court receives the mandate of this Court with specific instructions, the lower court is without discretion to ignore that mandate or disregard the instructions."). Based on this error, Ventura claims the trial court should have granted an evidentiary hearing on all his claims, thereby obviating the need for a Huff hearing. We disagree. The trial court's finding as to the necessity of an evidentiary hearing does not depend on the State's filing of a response to the defendant's motion for postconviction relief. See Mordenti v. State, 711 So.2d 30, 32 (Fla.1998) ("The purpose of what has now come to be known as a `Huff hearing' is to allow the trial judge to determine whether an evidentiary hearing is required and to hear legal argument relating to the motion.").
[8] Stark could only confirm that at least the two most recent letters, those dated January 20 and October 31, 1998, would not have been in the open file because they were created after Ventura's trial.
[9] McDonald admitted to the convictions on direct examination by the State, but defense counsel explored the convictions in greater detail during cross-examination.
[10] The deposition in question was taken on May 4, 1983. McDonald was charged with the first degree murder of Ventura, but was discharged on speedy trial grounds. McDonald's discharge was affirmed by the Fifth District on February 2, 1983. See State v. McDonald, 425 So.2d 1380 (Fla. 5th DCA 1983).
[11] The five claims are: (1) failure to raise trial court's consideration of defendant's silence and assertion of innocence in aggravation; (2) failure to raise trial court's finding of no mitigation; (3) failure to raise issue of burden shifting and vague penalty phase jury instructions; (4) failure to raise the absence of the trial judge and the defendant during portions of the trial; and (5) failure to fully argue the attorney conflict issue.
[12] As to claims one through three, Ventura appears to be improperly attempting to use this habeas petition as a substitute or an additional appeal of his postconviction motion. Hardwick v. Dugger, 648 So.2d 100, 105 (Fla. 1994) ("[H]abeas corpus petitions are not to be used for additional appeals on questions which could have been ... or were raised on appeal or in a rule 3.850 motion, or on matters that were not objected to at trial.") (quoting Parker v. Dugger, 550 So.2d 459, 460 (Fla. 1989)). Additionally, these claims concern issues which were not preserved at trial, and as we have noted on numerous occasions, appellate counsel cannot be deemed ineffective for failing to raise unpreserved issues. See Teffeteller v. Dugger, 734 So.2d 1009 (Fla. 1999); Right v. Dugger, 574 So.2d 1066, 1071 (Fla.1990); Swafford v. Dugger, 569 So.2d 1264, 1266 (Fla.1990).

As to claim four, the record does not support Ventura's claim that he was absent during portions of the trial. The record, however, does indicate that the trial judge was absent when the State and defense marked the State's exhibits for identification prior to trial. The record further reflects that after the exhibits were marked, the judge was absent during the examination of the Volusia County evidence custodian. During the testimony of the evidence custodian, the defense stipulated to the chain of custody. Nevertheless, the evidence custodian testified at trial in the presence of both Ventura and the trial judge, during which time the court was made aware of the stipulation. Accordingly, we can discern no prejudice flowing from the absence of the trial judge. Further, when made aware of the stipulation the court inquired if the stipulation was acceptable to the defense to which the defense answered in the affirmative.
Lastly, claim five is wholly without merit. On direct appeal appellate counsel raised the attorney conflict issue with regards to the denial of Ventura's motions to discharge his trial counsel and his conflict of interest claims. This Court found no merit to Ventura's claims of error. See Ventura, 560 So.2d at 220. Ventura claims that appellate counsel was ineffective because he failed to make this Court "aware that it had already found in favor of [Ventura] on the conflict issue," in granting the public defender's motion to withdraw as Ventura's counsel on direct appeal. The granting of the public defender's motion to withdraw, however, was distinct from the conflict issue presented at trial by Ventura and raised as a claim of error on direct appeal. The public defender's office withdrew from Ventura's representation on appeal because of the conflict of interest inherent in having to advance an argument on appeal challenging the propriety of the trial court's denial of Ventura's motion to discharge his trial counsel. Argument of that issue would have required the public defender's office to criticize the representation provided Ventura by its own office. Moreover, counsel can hardly be deemed deficient for failing to make this Court "aware" of its own order.
[13] At trial, Postal Inspector Berger testified:

Q. Did Ventura's flight affect Mr. McDonald's prosecution?
A. Yes, sir. It was our position that we could not successfully prosecute one without the other.
[14] See United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir.1995) (ruling that the standard of materiality for such claims is equivalent to the "`harmless beyond a reasonable doubt' standard" of Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); see also United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "The Court in Chapman noted that there was little, if any, difference between a rule formulated, as in Napue, in terms of `whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction,' and a rule `requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Id. at 679-80 n. 9, 105 S.Ct. 3375.